IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VINCENT MERCER,                    :    CIVIL ACTION
                                   :    NO. 12-6929
          Plaintiff,               :
                                   :
     v.                            :
                                   :
SOUTHEASTERN PENNSYLVANIA           :
TRANSIT AUTHORITY, et al.,         :
                                   :
          Defendants.              :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                         June 18, 2014

     Plaintiff Vincent Mercer brings this disability
discrimination action against his former employer, Defendant
Southeastern Pennsylvania Transportation Authority, and two of
his former supervisors, Defendants Leander Berry and Jason
Griffin (collectively, "SEPTA"). Mercer claims he was denied a
reasonable accommodation for his disability, that he was
retaliated against, that his employment was terminated on the
basis of his disability, and that he was subjected to a hostile
work environment, all in violation of the Americans with
Disabilities Act ("ADA"), and the Pennsylvania Human Relations
Act ("PHRA"). SEPTA has moved for summary judgment, and, for the
reasons that follow, the Court will grant the motion in its
entirety.

## I.   FACTUAL BACKGROUND

Mercer worked as a maintenance custodial bus driver for SEPTA from 2001 until approximately January 14, 2011. Pl. Statement Facts ¶¶ 1, 136, ECF No. 16-2; Def. Statement Facts ¶¶ 1, 33, ECF No. 14-3. Mercer's responsibilities in that position included custodial tasks such as keeping the buses clean and driving buses between bus depots for service. Def. Statement Facts ¶ 2. Throughout his employment with SEPTA, Mercer was a member of Transport Workers Union Local 234 ("the Union"), and the terms of his employment were governed by a Collective Bargaining Agreement ("CBA"). Id. ¶ 3.

In 2004, Mercer was diagnosed with diabetes, high blood pressure, and high cholesterol. Id. ¶ 4. On June 21, 2010, Mercer obtained a note from his doctor stating the following:

> Vincent Mercer [has] been a patient for (6) years, he has hypertension and diabetes. He states that he needs to take his medicine at a specific time because it helps him to be more compliant and causes less side effects. He also states working in overheated conditions cause [sic] presyncopal[1] symptoms—which can occur with anyone, but worse with hypertensive patients.

---

[1]     Presyncope is a state of lightheadedness, blurred vision, and/or feeling faint that can lead to loss of consciousness. Alexander G. Reeves & Rand S. Swenson, Disorders of the Nervous System: A Primer, Chapter 14 (2008), available at www.dartmouth.edu/~dons/part_2/chapter_14.html#chpt_14_presyncop e.

Decl. of Jeffrey Erinoff, Ex. 1, Letter from Dr. Pasha Generette, June 21, 2010, ECF No. 14-5. Mercer gave the note to his supervisor at the time, who forwarded it to SEPTA's medical director, Dr. Jeffrey Erinoff. Def. Statement Facts ¶ 6.

A week later, on June 28, 2010, Mercer passed out while working on a hot bus. Pl. Statement Facts ¶ 16. He was taken by ambulance to the emergency room at Montgomery Hospital, where he "underwent a cardiac procedure." Decl. of Jeffrey Erinoff, Ex. 2, Letter from Montgomery Hospital, June 28, 2010, ECF No. 14-5. His treating physician cleared him to return to work on July 6, 2010, with the restriction that he "avoid excessive heat (buses without air conditioning) because this could worsen his cardiac and medical conditions." Id. Mercer provided the note containing those instructions to Dr. Erinoff during a physical examination on July 20, 2010. Def. Statement Facts ¶ 10; Pl. Resp. Def. Statement Facts ¶ 10, ECF No. 16-1. After discussing the restriction with Mercer, Dr. Erinoff recommended to Mercer's supervisors that he be permitted to clean buses with the air conditioning turned on when the outside temperature exceeded 90 degrees. Def. Statement Facts ¶ 11; Pl. Resp. Def. Statement Facts ¶ 11.

Mercer says that, despite Dr. Erinoff's recommendation, he was routinely assigned to work on buses without air conditioning during the remainder of the summer of 2010. Pl.

3

Statement Facts ¶ 19. Specifically, he contends that Defendant Berry, one of his supervisors, directed him to work on buses without air conditioning on an almost daily basis from the time he returned to work until Berry was relocated to a different bus depot in early October 2010.[2] Id. ¶¶ 19, 29. Mercer says that he frequently complained to his Union representatives and to his supervisors about his working conditions, but no changes were made. Id. ¶ 19. One of Mercer's coworkers, Robert Cohen, agrees that Mercer was assigned to work on hot buses even after he provided SEPTA with his doctor's note (although it is unclear which of the two notes Cohen is referring to). Id. ¶¶ 40-46.

In addition to being asked to work in excessively hot conditions, Mercer also claims that Berry frequently cursed at him, called him "fat," and made fun of him about his weight. Id. ¶ 21. He describes one particular incident in detail, during which Berry allegedly ridiculed him in front of coworkers by dropping something on the floor and asking him to "pick it the fuck up." Pl. Resp. Mot. Summ. J., Ex. A, Mercer Dep. 153:10, Oct. 4, 2013, ECF No. 16-3. Mercer also asserts that a different

---

[2]       There is a dispute of fact as to precisely when Berry was transferred to a different facility. According to Berry's deposition testimony, he was transferred before September 27, 2010. See Def. Statement Facts ¶¶ 25-26. Mercer disagrees with that assertion, however, claiming instead that Berry remained his supervisor until early October 2010. Pl. Statement Facts ¶ 29. In accordance with the summary judgment standard, the Court accepts Mercer's version of events.

supervisor, Jim Heiser, would sometimes yell at him, throw keys
at him, and snatch papers from him. Pl. Statement Facts ¶ 31.

On August 18, 2010, Mercer had a confrontation with Berry
that led to the temporary termination of his employment.
Although the parties dispute many of the details of the event,
they agree that Berry demanded that Mercer transport a bus to a
different facility, and that Mercer did not do so, instead
leaving work early. Def. Statement Facts ¶¶ 14-15; Pl. Statement
Facts ¶¶ 20, 26. They also agree that Berry used the phrase
"direct order" when asking Mercer to move the bus. Def.
Statement Facts ¶ 16; Pl. Statement Facts ¶ 24. Mercer maintains
that he did not move the bus because he was not feeling well
after cleaning buses with no air conditioning all day. Pl.
Statement Facts ¶ 23. He also says that it was unclear to him
whether Berry was actually giving him a direct order, and that
he believed he had permission to leave from Berry's supervisor,
Defendant Jason Griffin. Id. ¶¶ 24-25.

When Mercer came to work the next morning, August 19,
2010, Griffin informed him that he was being "held off" (i.e.,
suspended) until further notice pending an investigation into
the incident. Id. ¶ 27; Def. Statement Facts ¶ 19. That
investigation resulted in Griffin concluding that Mercer had
violated a direct order from his supervisor, which subjected him
to immediate termination. Def. Statement Facts ¶ 20; Decl. Jason

Griffin, Ex. 1, Authority Standard Rules, at 14-15, ECF No. 14-9. The Union appealed that determination, and – following the procedures provided for in the CBA – the Union and SEPTA entered into a settlement agreement that permitted Mercer to return to work. Def. Statement Facts ¶¶ 21-23. Pursuant to that agreement, Mercer was placed on "Last Chance" status, which meant that he would be automatically discharged if he incurred any disciplinary actions during the next 730 days. Id. ¶ 23. Mercer signed the agreement and returned to work after completing a physical examination on September 27, 2010.

After Mercer returned to work, he accumulated several warnings for violating SEPTA's "Vehicle Maintenance Information System" ("VMIS"), which is a computer program SEPTA uses to track employees' time and to assign work. Id. ¶¶ 27, 32. Pursuant to a 2005 Memorandum of Understanding between SEPTA and the Union, an employee who receives six violation notices in a year is advanced one level on SEPTA's progressive discipline policy. Id. ¶ 29. Mercer received his sixth violation notice on December 27, 2010, and so he was advanced one disciplinary step. Id. ¶ 33. Because he was already on "Last Chance" status, however, SEPTA terminated Mercer's employment effective January 14, 2011. Id. Mercer disputes the accuracy of several of the violation notices he received. See Pl. Statement Facts ¶¶ 4-8, 30, 134-135.

6

The Union appealed Mercer's discharge, the appeal progressed through the steps provided for in the CBA, and the matter was eventually scheduled for arbitration. Def. Statement Facts ¶¶ 34-37. Prior to the arbitration date, however, the Union and SEPTA again agreed to a settlement, pursuant to which Mercer would again be permitted to return to work on "Last Chance" status. Id. ¶ 37. This time, Mercer refused to sign the agreement, as he had filed a claim against SEPTA with the Equal Employment Opportunity Commission ("EEOC") and he was concerned that by signing the agreement he would be waiving his rights to pursue a lawsuit against SEPTA. Pl. Statement Facts ¶¶ 127, 130-133, 142-143. Mercer therefore never returned to work after his discharge on January 14, 2011.

## II.  PROCEDURAL HISTORY

On July 8, 2011, Mercer filed a charge of discrimination under the ADA and the PHRA with the EEOC, and he was issued a right-to-sue letter on September 20, 2012. Compl. ¶ 5, ECF No. 1. He then timely filed the instant complaint. SEPTA answered on March 19, 2013 (ECF No. 6), and then moved for summary judgment following the completion of discovery (ECF No. 14). Mercer responded on March 23, 2014 (ECF No. 16), and the matter is now ripe for disposition.

## III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

8

**IV.   DISCUSSION**

In his complaint, Mercer brings claims of disability discrimination and retaliation under the ADA and the PHRA,[3] as well as a claim under 42 U.S.C. § 1983. Specifically, Mercer contends that SEPTA failed to reasonably accommodate his disability, subjected him to a discriminatorily hostile work environment, unlawfully terminated his employment on the basis of his disability, and retaliated against him for requesting accommodation and for filing an EEOC charge. With regard to the § 1983 claim, Mercer says that SEPTA's actions constitute violations of the First and Fourteenth Amendments. SEPTA argues that Mercer has presented insufficient evidence for a reasonable jury to find in his favor on any of his claims, and thus that Defendants are entitled to judgment as a matter of law. The Court addresses each of Mercer's claims in turn.

A. <u>Failure to Accommodate</u>

Broadly speaking, the ADA bars an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1)

---

[3]      As the Third Circuit has observed, "[t]he PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts." <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 382 (3d Cir. 2002) (alteration and internal quotation marks omitted). Accordingly, the Court's disposition of Mercer's ADA claims will apply with equal force to his PHRA claims.

9

he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting Gaul v. Lucent Tech., 143 F.3d 576, 580 (3d Cir. 1998)). The adverse employment decisions barred by the ADA include "not only adverse actions motivated by prejudice and fear of disabilities, but also . . . failing to make reasonable accommodations for a plaintiff's disabilities." Id. Specifically, the ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

Mercer maintains that he is disabled due to his diabetes, high blood pressure, and high cholesterol, and SEPTA does not contest that he is a "disabled person within the meaning of the ADA." See Taylor, 184 F.3d at 306. SEPTA also does not contest that Mercer was able to perform the essential functions of his job, either with or without accommodation. Rather, SEPTA argues that it was under no duty to provide an accommodation because

10

Mercer did not specifically request one, and that, in any event, SEPTA granted Mercer's "vague request" to avoid excessive heat. Def. Mem. Supp. Mot. Summ. J. 14, ECF No. 14-2. Mercer responds that his two doctors' notes were each independently sufficient to constitute requests for accommodation, and that, although Dr. Erinoff asked that the accommodation be granted, Mercer's supervisors disregarded that request and failed to implement the accommodation.

Before turning to those arguments, however, the Court must determine the time frame relevant to this inquiry. SEPTA contends that, due to the statutory time period for filing EEOC claims provided for in the ADA, the Court should consider only those events that occurred on or after September 11, 2010. Under the ADA, a plaintiff who initially seeks relief from a state or local agency has 300 days from the alleged unlawful employment practice to file a charge of employment discrimination with the EEOC. See 42 U.S.C. § 12117 (providing that the same procedures used to enforce Title VII of the Civil Rights Act of 1964 apply to ADA employment discrimination claims); 42 U.S.C. § 2000e-5(e)(1) (establishing the 300-day limitation period); see also Zankel v. Temple Univ., 245 F. App'x 196, 198 (3d Cir. 2007) (not precedential) (applying the 300-day limitation period to an ADA claim). A claim that is not filed within that time period becomes time-barred, and the claimant "lose[s] the ability to

recover for it." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109-110 (2002).

In this case, Mercer filed his EEOC charge on July 8, 2011, which means that the Court can consider only those allegedly unlawful employment practices that occurred after September 11, 2010 – 300 days before the charge was filed. See id. (explaining that the language of Title VII dictates that "a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC") (emphasis in original). Presuming for the sake of argument that Mercer's two doctors' notes could be considered requests for accommodation, Mercer made those requests on June 21, 2010, and on July 20, 2010 – well before the September 11 cutoff. Therefore, accepting Mercer's assertion that his requests were never in fact granted, the complained-of denials of accommodation occurred outside of the 300-day window, and therefore appear to be time-barred.

Mercer does not dispute that September 11, 2010, marks the statutory cutoff for his claims. Instead, he suggests that the Court should consider his failure-to-accommodate claims because he continued to request accommodation throughout the summer of 2010, and SEPTA's "denial of the requested accommodation continued until October 2010," when Defendant Berry was transferred to a different bus facility. Pl. Mem. Opp'n Def. Mot. Summ. J. 4, ECF No. 16. In so suggesting, Mercer

seems to be making two somewhat distinct legal arguments: (1) that the Court should consider denials of reasonable accommodations that occurred <u>before</u> September 11, 2010, under the "continuing violations doctrine"; and (2) that an independently recoverable denial of a requested accommodation occurred during the relevant time period.

With regard to the first argument, the case law in this circuit reveals that Mercer cannot make use of the continuing violations doctrine in this instance. The continuing violations doctrine is an "equitable exception to the timely filing requirement" that applies "when a defendant's conduct is part of a continuing practice." <u>Cowell v. Palmer Twp.</u>, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted). The doctrine renders an action "timely so long as the last act evidencing the continuing practice falls within the limitations period." <u>Id.</u> To make use of the doctrine in the employment discrimination context, a plaintiff must show that the complained-of employment practice is of a type that involves repeated conduct that takes place "over a series of days or perhaps years," as opposed to a "discrete act[]" that is actionable on its own. <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 115. Employment practices that constitute independently actionable discriminatory acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." <u>Id.</u> at 113.

An employer's denial of a request for a reasonable accommodation is a discrete act of discrimination that is an independently actionable unlawful employment practice under the ADA. 42 U.S.C. § 12112(b)(5)(A); see also Zankel, 245 F. App'x at 198-99 (declining to apply the continuing violations doctrine and dismissing as untimely plaintiff's claims regarding denials of requests for accommodation that occurred outside of the 300-day timeframe). As discussed above, the ADA expressly defines an actionable act of discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," which means that failure to accommodate is a separately actionable "unlawful employment practice" akin to wrongful termination or failure to hire. 42 U.S.C. § 12112(b)(5)(A); see also Nat'l R.R. Passenger Corp., 536 U.S. at 114 ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). Accordingly, the continuing violations doctrine does not provide a basis for the Court to consider any of Mercer's requests for accommodation that were denied before September 11, 2010. In particular, the Court cannot consider SEPTA's alleged failures to comply with the requests in either of Mercer's doctors' notes (to the extent those notes can be read to be requesting accommodation).

14

As for Mercer's contention that he has an actionable claim because he continued to request accommodation during the relevant time period, that argument also fails. First of all, if an employee could render a claim timely by simply renewing a previously denied request, the limitations period would be rendered meaningless. As the Third Circuit explained in the wrongful termination context, "[t]he repeated refusal of an employer to reinstate an employee to a formerly held position . . . does not give rise to a new claim of discrimination," as permitting such a claim "would clearly vitiate the intent behind the 300-day time limit." Zdziech v. DaimlerChrysler Corp., 114 F. App'x 469, 471-72 (3d Cir. 2004) (not precedential). The same is true here. Mercer alleges that he requested accommodation in June and July 2010, and that, despite his repeated complaints, his employer never granted the requested accommodation. Accepting those assertions as accurate, the denial of Mercer's requested accommodation occurred well outside the 300-day time window, and thus should be time-barred. Permitting Mercer to restart the clock by again asking for the same accommodation to no avail would therefore undercut the statutory limits imposed by Congress.

Moreover, even if Mercer could theoretically bring a claim based upon a reasserted request for an accommodation, there is no evidence upon which a reasonable jury could conclude

15

that Mercer actually requested and was denied an accommodation
within the statutory period. Mercer asserts generally that he
continued to complain about being assigned to buses without air
conditioning, but he does not specify when he made those
complaints. See Mercer Dep. 138:3-139:5, 142:4-16. In fact,
Mercer indicated in his deposition that, after he returned to
work in September 2010, he no longer complained to his
supervisors about having to work on buses without air
conditioning because his previous complaining had no effect. See
id. 191:3-192:15. Based on that evidence, no reasonable
factfinder could conclude that Mercer requested and was denied
an accommodation from his employer after September 11, 2010.

    For all of those reasons, Mercer's claims based upon
SEPTA's alleged failure to reasonably accommodate his disability
are time-barred. The Court will therefore grant SEPTA's motion
for summary judgment as to those claims.[4]

    B. Hostile Work Environment

    Mercer also contends that SEPTA subjected him to a
discriminatorily hostile work environment, in violation of the

---

[4]    Because Mercer's failure-to-accommodate claims are
time-barred, the Court need not address the parties' arguments
regarding whether Mercer's doctors' notes can be considered
requests for accommodation that triggered the "interactive
process" requirement, see Taylor, 184 F.3d at 311-12, nor must
it consider whether the evidence shows that SEPTA in fact
granted the requested accommodation.

ADA.[5] To establish a hostile work environment claim, an ADA
plaintiff must show that he suffered intentional discrimination
because of his disability; the discrimination was "sufficiently
severe or pervasive to alter the conditions of [his] employment
and create an abusive working environment"; the discrimination
detrimentally affected him; and it would have detrimentally
affected a reasonable person in his position. Walton v. Mental
Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999)
(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993));
see also Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d
Cir. 2013) (describing the elements of a hostile work
environment claim generally). When deciding whether those
elements are established, courts must evaluate the record "as a
whole," concentrating "not on individual incidents, but on the
overall scenario." Cardenas v. Massey, 269 F.3d 251, 261 (3d
Cir. 2001). Relevant circumstances may include "the frequency of

---

[5]        Although the Third Circuit has not definitively
decided whether a hostile work environment cause of action
exists under the ADA, it has presumed the existence of such a
claim, and numerous district courts in this circuit have
concluded that such claims are actionable under the ADA. See
Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 313 (3d Cir.
2006) (addressing a hostile work environment claim under the ADA
without discussing whether such a cause of action exists);
Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 666-67
(3d Cir. 1999) ("[W]e will assume this cause of action without
confirming it . . . ."); see also Motto v. Union City, No. 95-
5678, 1997 WL 816509 (D.N.J. Aug. 27, 1997) (discussing other
courts' conclusions that harassment is actionable under the
ADA).

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Mandel, 706 F.3d at 168 (quoting Harris, 510 U.S. at 23); see also Lescoe v. Pa. Dep't of Corr.-SCI Frackville, 464 F. App'x 50, 54 & n.8 (3d Cir. 2012) (not precedential) (applying that standard to an ADA claim).

As with his failure-to-accommodate claims, Mercer faces a potential timeliness obstacle to bringing his hostile work environment claim. Mercer bases his hostile work environment claim on Defendant Berry's alleged weight-based harassment and teasing.[6] See Pl. Mem. Opp'n Def. Mot. Summ. J. 6. Yet Berry was transferred to a different facility in early October 2010 (at the latest), meaning that most – if not all – of the complained-of comments occurred before September 11, 2010, and thus were outside of the 300-day time window.

Nonetheless, unlike an employer's failure to accommodate, a hostile work environment claim involves repeated conduct that may only become actionable over time. Nat'l R.R. Passenger Corp., 536 U.S. at 115. It is therefore possible for Mercer to make use of the continuing violations doctrine in this instance,

---

[6]     Although Mercer also describes teasing and harassment by supervisor Jim Heiser, he concedes that there is no indication that Heiser's conduct was related to Mercer's disability. See Mercer Dep. 202:19-22.

provided that he satisfies the requirements for its application. See id. at 117. As discussed above, the doctrine renders an action "timely so long as the last act evidencing the continuing practice falls within the limitations period." Cowell, 263 F.3d at 292. As the Supreme Court has explained, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Nat'l R.R. Passenger Corp., 536 U.S. at 117.

But the continuing violations doctrine cannot save Mercer's claim here, for several reasons. First, there is no evidence that any of the complained-of harassment actually occurred during the 300-day time window. That window began on September 11, 2010, while Mercer was absent from work pending the resolution of his discharge for violating a direct order. Mercer did not return to work until September 27, 2010, and Berry was transferred in early October, meaning that there was a very narrow window in which any harassment may have occurred. Mercer does not point to any particular incidents that occurred during that window of time. In fact, he provides no specific details regarding when Berry would make the alleged weight-based comments, stating only that Berry "constantly" talked about Mercer's weight. See Mercer Dep. 74:11-13, 150:14-152:17. Mercer therefore has not met his burden of showing that an act

evidencing the hostile environment occurred within the filing period.

Second, even if Mercer had made such a showing, he cannot succeed because he has not established that Berry's harassment was "because of [Mercer's] disability." See Walton, 168 F.3d at 667. Standing alone, "[t]he fact that [Berry's] behavior toward [Mercer] may have been offensive does not indicate that it was based on [Mercer's] disability," as is required for liability under the ADA. Id. Here, Mercer claims that Berry harassed him because of his weight, which in some circumstances could be sufficient to establish a hostile work environment claim. See, e.g., Motto v. Union City, No. 95-5678, 1997 WL 816509 (D.N.J. Aug. 27, 1997) (concluding that plaintiff was disabled due to his obesity, and that a jury question existed as to "whether defendants [sic] name-calling and comments about his weight were severe and pervasive enough" to constitute a hostile work environment). But Mercer claims to be disabled due to his diabetes, high blood pressure, and high cholesterol – not due to his weight or obesity. Although Mercer asserts that his overweight status is caused by his diabetes, he has presented no evidence that Berry viewed the two as related, nor does he assert that his weight limited any major life activity. Mercer therefore has not shown that his weight constitutes a disability, and so the alleged weight-based harassment cannot

amount to a <u>discriminatorily</u> hostile work environment. <u>Harris</u>, 510 U.S. at 21 (explaining that plaintiffs can seek relief when exposed to a "discriminatorily hostile or abusive environment"); <u>see also</u> <u>Lescoe</u>, 464 F. App'x at 54 (concluding that, because plaintiff's obesity did not amount to a disability under the ADA, the alleged weight-based harassment did not constitute a hostile work environment).

Finally, even if Berry's offensive comments were related to Mercer's disability, there is no evidence that they were "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." <u>Walton</u>, 168 F.3d at 667; <u>see also</u> <u>Lescoe</u>, 464 F. App'x at 52, 54 (concluding that frequent "jokes and comments about [plaintiff's] weight, the size of his belly, and not being able to see his groin area" did not rise to that level). Although Mercer claims to have been "constantly" harassed, he points to only one particular incident of harassment, which standing alone is insufficient to establish a hostile work environment claim. <u>Caver v. City of Trenton</u>, 420 F.3d 243, 262 (3d Cir. 2005) (explaining that, unless extremely serious, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim). Without more detail regarding the nature and circumstances surrounding Berry's additional comments, no reasonable juror has a proper basis for concluding that the

21

harassment was so "severe or pervasive" that it can be said to have altered the conditions of Mercer's employment. See Harris, 510 U.S. at 21. The Court will therefore grant SEPTA's motion for summary judgment as to Mercer's hostile work environment claim.

C. Wrongful Termination

Mercer's next contention is that his employment was unlawfully terminated because of his disability. As with a failure-to-accommodate claim, a plaintiff must first establish a prima facie case of discrimination under the ADA in order to recover for an allegedly wrongful termination. Taylor, 184 F.3d at 306. If the plaintiff succeeds in making out a prima facie case, then, under the familiar McDonnell Douglas framework, "the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (internal quotation marks omitted) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); see also Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (applying the McDonnell Douglas framework to ADA claims). If the defendant states such a reason, the presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination. Anderson, 621 F.3d at

271; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993) (explaining that, if a defendant produces a nondiscriminatory reason for its action, plaintiff has an opportunity to show "that the proffered reason was not the true reason for the employment decision and that race was") (citation and internal quotation marks omitted). Throughout this burden-shifting process, "the ultimate burden of proving intentional discrimination always rests with the plaintiff." Anderson, 621 F.3d at 271.

In order to establish that an employer's proffered justification is merely a pretext for discrimination, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). To meet that burden, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." Fuentes, 32 F.3d at 765; see also Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason."). Evidence undermining an employer's proffered reason

23

therefore must be sufficient to "support an inference that the employer did not act for its stated reasons." <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 731 (3d Cir. 1995). A plaintiff can satisfy that burden at the summary judgment stage by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for its action "that a reasonable factfinder could rationally find them 'unworthy of credence.'" <u>Burton</u>, 707 F.3d at 427 (quoting <u>Fuentes</u>, 32 F.3d at 765).

Here, Mercer asserts that the events leading to the termination of his employment on January 14, 2011, were the product of discriminatory animus. Specifically, Mercer challenges the decision to place him on "Last Chance" status when he resumed work on September 27, 2010, the termination of his employment on January 14, 2011, and SEPTA's failure to reinstate him. SEPTA responds by offering legitimate, nondiscriminatory reasons for its actions. According to SEPTA, Mercer was discharged and then placed on "Last Chance" status due to his refusal to comply with a direct order from his supervisor, and his employment was subsequently terminated because he accrued six VMIS violation notices while on "Last Chance" status. Therefore, assuming for the sake of argument that Mercer has established all of the elements of his prima facie case, he must provide evidence showing that those

proffered justifications are a mere pretext for discrimination in order to survive summary judgment.

Mercer has made no effort to do so, not once mentioning the word "pretext" in his response to SEPTA's motion for summary judgment. Furthermore, although he disagrees with SEPTA's characterization of his actions and disputes the bases for several of his VMIS violations, at best those contentions suggest that SEPTA's decisions were "wrong or mistaken," not that they were actually the product of discriminatory animus. See Fuentes, 32 F.3d at 765. Mercer had an opportunity to air his substantive disagreements with SEPTA's decisions using the mechanisms provided for in the CBA. The ADA does not provide him with a means to relitigate those disputes in federal court, as the statute addresses only discriminatory employment actions, not actions that simply may be unfair or unwarranted. Cf. Davis v. Solid Waste Serv., Inc., No. 12-5628, 2014 WL 2084896, at *14, -- F. Supp. 2d. -- (E.D. Pa. May 19, 2014) (Robreno, J.) (explaining in the Title VII context that antidiscrimination statutes do not "create a federal forum in which to adjudicate every grievance connected to the workplace"). Therefore, as Mercer has not pointed to any evidence that would allow a reasonable juror to find that SEPTA's proffered reasons for its actions are a mere pretext for disability discrimination, SEPTA

is entitled to summary judgment on his wrongful termination claim.

    D. Retaliation

    Mercer's final claim under the ADA[7] is that SEPTA retaliated against him for his requests for accommodation and for his filing of an EEOC charge. To establish a prima facie case of retaliation, "a plaintiff must show: (1) that s/he engaged in a protected employee activity; (2) that s/he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action." Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005); see also Shaner, 204 F.3d at 500 (identifying those elements in the ADA context). An "adverse employment action" in this context is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 548 U.S., 53 68 (2006) (internal quotation marks omitted). As for the causation analysis, it is highly fact-based, and depends on the particular context in which the events occurred. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). A plaintiff can generally establish a causal connection by showing

---

[7]    As explained above, see supra note 3, the analysis of Mercer's ADA claims applies with equal force to his PHRA claims.

that the temporal proximity between the protected activity and the adverse action is "unusually suggestive," or through a combination of timing and other evidence of ongoing antagonism or retaliatory animus. Id. If a plaintiff establishes a prima facie case of retaliation, the court continues to the subsequent steps in the McDonnell Douglas framework outlined above. Shaner, 204 F.3d at 500.

In this case, Mercer identifies as "adverse actions" all of the disciplinary events leading to his discharge, beginning with SEPTA's decision to place him on "Last Chance" status on September 27, 2010. See Pl. Resp. Opp'n Def. Mot. Summ. J. 16. But Mercer has presented no evidence pointing to a causal connection between those events and a protected employee activity. With regard to the EEOC charge, it was filed on July 8, 2011 – after Mercer's employment was terminated on January 14, 2011.[8] As for the requests for accommodation, they were

---

[8]      Mercer also suggests that SEPTA retaliated against him by including a provision in the proffered settlement agreement that he read to prevent him from pursuing his EEOC charge. But that settlement was reached after Mercer's employment was terminated, and the Third Circuit has explained that, "[o]nce [an employee's] employment [is] terminated[,] it [is] not possible for her to suffer adverse employment action." Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 516 (3d Cir. 2004); see also Jamison v. Campbell Chain Cooper Tool, No. 07-0324, 2008 WL 857526, at *2 (M.D. Pa. Mar. 27, 2008) ("The adverse employment action must occur during the term of employment, and an employer's post-termination activity cannot provide the basis for a retaliation claim."). The terms of the post-termination

separated in time from Mercer's placement on "Last Chance" status by more than a month, and from Mercer's termination by approximately six months, which is a far cry from the time frames the Third Circuit has considered to be particularly suggestive of a causal connection. See, e.g., Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (finding seven days unduly suggestive); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two days); see also Farrell, 206 F.3d at 278-79 (declining to decide whether a three to four week period between the two events would be sufficient – by itself – to support an inference of causation). Mercer also has not demonstrated a pattern of antagonism that could suggest a causal connection; the primary antagonism he identifies is the treatment he received from Berry, who was transferred to a different facility in October 2010, several months before the termination of Mercer's employment.

Furthermore, even if Mercer could establish a prima facie case of retaliation, he has not established that SEPTA's proffered reasons for its action are a pretext for discrimination. As with his wrongful termination claim, Mercer "has not presented sufficient evidence to permit a factfinder to either disbelieve [SEPTA's] reasons, or to conclude that

settlement agreement are therefore not relevant to Mercer's retaliation claim.

retaliation was the real reason" for the allegedly improper employment decisions. See Shaner, 204 F.3d at 502. Accordingly, the Court will grant SEPTA's motion for summary judgment as to Mercer's retaliation claim.

E. Section 1983

In addition to his ADA and PHRA claims, Mercer also seeks to bring the same allegations against individual defendants Berry and Griffin in the form of a § 1983 claim. Specifically, he says that Berry and Griffin deprived him of his right to equal protection under the law, and he asserts that they retaliated against him for exercising his free speech rights under the First Amendment. Pl. Resp. Opp'n Def. Mot. Summ. J. 19. SEPTA argues that Mercer cannot succeed on his § 1983 claims because Congress has foreclosed § 1983 actions that seek to recover for alleged ADA violations.

It is true that, although Mercer frames his § 1983 allegations as direct constitutional claims, they are based on precisely the same set of facts that underpin his ADA claims, and many courts have concluded that plaintiffs are foreclosed from bringing a § 1983 claim based on alleged ADA violations. Generally speaking, § 1983 provides a means for a plaintiff to seek redress for a violation of a federal right. Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989). Section 1983 is unavailable to enforce statutory rights in two

29

situations, however: (1) "where Congress has foreclosed such enforcement of the statute in the enactment itself"; and (2) "where the statute did not create enforceable rights, privileges or immunities within the meaning of § 1983." S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 274 F.3d 771, 779 (3d Cir. 2001) (quoting Wright v. City of Roanoke Redev. & Hous. Auth., 479 U.S. 418, 423 (1987)). One way that Congress may foreclose a remedy under § 1983 is "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Blessing v. Freestone, 520 U.S. 329, 341 (1997). The only two circuit courts to have considered whether the ADA creates such a "comprehensive enforcement scheme" have concluded that it does – foreclosing a remedy under § 1983. See Okwu v. McKim, 682 F.3d 841, 844-45 (9th Cir. 2012); Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1530-31 (11th Cir. 1997).

Nonetheless, the Third Circuit has not yet addressed this issue, and courts in this district are divided on whether a plaintiff can seek to vindicate rights under the ADA using § 1983. Compare Lee v. Se. Pa. Transp. Auth., 418 F. Supp. 2d 675, 680 (E.D. Pa. 2005) (permitting a plaintiff to amend her complaint to include a § 1983 claim that "seeks to vindicate rights under the ADA"), with Wesley v. Vaughn, No. 99-1228, 2001 WL 210285, at *4 (E.D. Pa. Feb. 28, 2001) (concluding "that

30

plaintiffs may not bring § 1983 actions for violations of the ADA"). Furthermore, the defendant bears the burden of "showing that allowing a § 1983 action to go forward in these circumstances 'would be inconsistent with Congress' carefully tailored [enforcement] scheme.'" S. Camden Citizens in Action, 274 F.3d at 780. Here, SEPTA has not made such a showing, instead summarily concluding that "Congress has foreclosed the enforcement of the ADA through Section 1983" because various non-binding opinions have said so. Def. Mem. Supp. Mot. Summ. J. 25. The Court therefore lacks a proper foundation to conclude categorically that Congress has foreclosed the use of § 1983 to enforce rights under the ADA.

But Mercer still cannot succeed on his § 1983 claims, as there is no factual basis upon which a reasonable juror could find in his favor. As discussed above, Mercer purports to base his § 1983 claims on alleged violations of the Equal Protection Clause and the First Amendment. "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009). As discussed in the context of his ADA claims, Mercer has not established any purposeful discrimination on the basis of his disability by SEPTA or his supervisors. With regard to the First

Amendment retaliation claim, Mercer must show both that he engaged in an activity protected by the First Amendment and "that the protected activity was a substantial factor in the alleged retaliatory action." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241 (3d Cir. 2006). Mercer's First Amendment claim therefore fails for the same reason as his retaliation claim under the ADA: he has not shown any causal relationship between a protected activity and an adverse action by SEPTA.

At base, Mercer's constitutional claims under § 1983 are substantively the same as his claims under the ADA, and thus they fail for the same reasons. The Court will therefore grant summary judgment to Defendants on Mercer's § 1983 claims.

**V.   CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment and enter judgment in favor of Defendants on all of Plaintiff's claims. An appropriate order follows.